# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Case No. 1:21-cv-394-UA-JLW

| | | |
|---|---|---|
| **HERMENA MILES BUMPASS,** | ) | |
| **as Administratrix of the Estate of** | ) | |
| **J'Mauri Jysha Bumpass and in her** | ) | |
| **individual capacity, and** | ) | |
| **JERRY JEROME BUMPASS, JR.** | ) | |
| **in his individual capacity,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **CLARENCE F. BIRKHEAD,** | ) | **BRIEF IN SUPPORT OF** |
| **in his individual capacity and** | ) | **PLAINTIFFS' RESPONSE** |
| **in his official capacity as Sheriff** | ) | **TO DEFENDANTS' MOTION** |
| **of Durham County, DURHAM** | ) | **TO DISMISS AMENDED** |
| **COUNTY, ANTHONY L.** | ) | **COMPLAINT** |
| **SHARP, JR., in his individual** | ) | |
| **capacity, ROBERT W. OSBORNE,** | ) | |
| **III, in his individual capacity,** | ) | |
| **BRENT CRIDER, in his individual** | ) | |
| **capacity, BRYCE D. MEYERS,** | ) | |
| **in his individual capacity, JIMMY D.** | ) | |
| **BUTLER, in his individual capacity,** | ) | |
| **and TRAVELERS CASUALTY** | ) | |
| **AND SURETY COMPANY** | ) | |
| **OF AMERICA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## INDEX

Authorities Cited…………………………………………… iii

## STATEMENT OF FACTS

Facts Alleged Leading to the Conclusion that Sharp and
Osborne, Acting in Concert, Fatally Shot J'Mauri
Bumpass……………………………………………….... 1

Facts Alleged Leading to the Conclusion that Defendants
Acted Pursuant to an Official Policy to Cover Up the
Fatal Shooting of J'Mauri Bumpass……………………..… 7

## ARGUMENT

I. THE FACTS ALLEGED STATE A CLAIM FOR USE
OF EXCESSIVE FORCE BY SHARP AND OSBORNE
IN VIOLATION OF THE FOURTH AMENDMENT……… 15

II. THE FACTS ALLEGED STATE A CLAIM FOR THE
ABUSE OF GOVERNMENTAL POWER BY SHERIFF
BIRKHEAD, SHARP, OSBORNE, CRIDER, MEYERS
AND BUTLER WHICH SHOCKS THE CONSCIENCE IN
VIOLATION OF THE FOURTEENTH AMENDMENT....... 22

III. THE FACTS ALLEGED STATE CLAIMS FOR
MUNICIPAL LIABILITY THROUGH A POLICY OF
COVERING UP THE USE OF EXCESSIVE FORCE
WHICH CAUSED DEFENDANTS' VIOLATIONS OF
THE FOURTH AND FOURTEENTH AMENDMENTS…... 31

IV. THE FACTS ALLEGED STATE CLAIMS FOR
ACTION ON SHERIFF BIRKHEAD'S OFFICIAL
BOND, WRONGFUL DEATH BY INTENTIONAL
ASSAULT AND BATTERY, COMMON LAW
OBSTRUCTION OF JUSTICE AND RECKLESS
INFLICTION OF EMOTIONAL DISTRESS UNDER
NORTH CAROLINA LAW

i

A.  ACTION ON OFFICIAL BOND…………………….….. 35

B.  ASSAULT AND BATTERY……………………………... 35

C.  OBSTRUCTION OF JUSTICE………………………….. 36

D.  RECKLESS INFLICTION OF EMOTIONAL
      DISTRESS……………………………………………….. 37

Conclusion……………………………………………….... 38

Certificate of Word Count……………………………….... 40

Certificate of Service……………………………………... 41

Case 1:21-cv-00394-CCE-JLW   Document 36   Filed 07/27/21   Page 3 of 46

# AUTHORITIES CITED

Armstrong v. City of Greensboro, 190 F. Supp. 3d 450
(M.D.N.C. 2016)........................................................................ 22

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)................... 22

County of Sacramento v. Lewis, 523 U.S. 833 (1998)............ 22

Dean v. McKinney, 976 F.3d 407 (4th Cir. 2020)................... 23

Farmer v. Brennan, 511 U.S. 825 (1994)................................ 17

Henry v. Deen, 310 N.C. 75, 310 S.E.2d 326 (1984).............. 36

Hunter v. Town of Mocksville, 897 F.3d 538 (4th Cir.
2018)............................................................................... 25, n2

Jackson v. Pantazes, 810 F.2d 426 (4th Cir. 1987)................. 20

Monell v. Department of Social Services of New York,
436 U.S. 658 (1978)................................................................ 32

Moore v. Evans, 124 N.C. App. 35, 476 S.E.2d 415 (1996)... 37

Parker v. Bladen County, 583 F. Supp. 2d 736 (E.D.N.C.
2008)........................................................................................ 33

Pembaur v. City of Cincinnati, 475 U.S. 469 (1986)............... 32

State v. Daughtridge, 248 N.C. App. 707, 789 S.E.2d 667
(2016)...................................................................................... 29

State v. Walker, 332 N.C. 520, 422 S.E.2d 716 (1992)........... 18

United States v. Bonner, 648 F.3d 209 (4th Cir. 2011),,.......... 17

United States v. Jackson, 863 F.2d 1168 (4th Cir. 1989)......... 17

United States v. Russell, 971 F.2d 1098 (4th Cir. 1992).......... 17

Case 1:21-cv-00394-CCE-JLW   Document 36   Filed 07/27/21   Page 4 of 46

N.C.G.S. § 58-76-5…………………………………………….. 35

N.C.G.S. § 153A-103…………………………………………….. 33

N.C.P.I. Civil 800.50 (2020).................................................. 35

N.C.P.I. Civil 800.51 (2020).................................................. 35

N.C.P.I. Civil 800.60 (2020).................................................. 38

iv

Facts Alleged Leading to the Conclusion that Sharp and

Osborne, Acting in Concert, Fatally Shot J'Mauri Bumpass

J'Mauri Bumpass, an eighteen-year-old black man, was driving home early
Sunday morning on December 15, 2019 (Amended Complaint, "AC," ¶ 79).
According to the incident report by Durham County Sheriff's deputy Defendant
Sharp ("Sharp"), he and trainee Defendant Osborne ("Osborne") pulled Mr.
Bumpass over on Meriwether Drive, just half a mile from Mr. Bumpass' home (AC
¶ 87).  To Durham Communications, Osborne gave the code for the stop of a
suspicious vehicle (AC ¶ 96).  In his incident report dated December 16, 2019,
Sharp claimed the reason for the stop was both a fictitious license plate and an
inactive driver's license (AC ¶¶ 124-125).  On December 15, 2019, however,
Osborne claimed they had stopped Mr. Bumpass because his driver's license was
inactive and said he and Sharp had not had a chance to run the license plate number
through DCI (Division of Criminal Information) (AC ¶¶ 99-100).

At the scene of the crash, Sharp said, "All I did was turn my blue lights on
him" before seeing the back windshield shatter and the car accelerate away (AC ¶¶
109, 117).  Osborne said they "pulled up, vehicle still rolling slow, pop, back glass
blew out, punched it, flipped" (AC ¶ 113).  In his incident report the next day,
however, Sharp claimed the car had stopped and as Sharp was exiting his patrol

1

car, he "heard one single gunshot and the glass on the driver side shattered" (AC ¶¶ 126-127). At the crash scene, Osborne also said he saw "the glass break and the smoke come out … that driver's side window" (AC ¶ 115).

The medical examiner later found J'Mauri Bumpass suffered a fatal contact gunshot wound to the head, a bullet having entered the right side of his skull and exited the left side (AC ¶ 123).

Mr. Bumpass had no history of depression, suicidal threats or expressions, other mental health issues, violence, or drug or alcohol dependence (AC ¶ 77). When he was pulled over by Sharp and Osborne, he had no criminal record, no warrant for his arrest, no contraband on his person or in his car, and no drugs or alcohol in his system (AC ¶¶ 75, 76). Mr. Bumpass had graduated early from high school, was working while preparing to attend college, and was actively involved in the lives of his siblings (AC ¶¶ 71-72, 74). Text messages show that at the time Sharp and Osborne pulled him over, Mr. Bumpass was on his way home to pick up his sister (AC ¶¶ 83-84).

Sharp and Osborne both reported to communications, "Shots fired" (AC ¶ 90). Sharp reported to communications, "Car is overturned multiple times" (AC ¶ 91). In his incident report, however, Sharp stated he had only heard "a loud noise which was consistent with a vehicle collision" and after rounding the curve to the

crash scene "discovered that the vehicle had struck a light pole and overturned" (AC ¶ 131).

Sharp reported to communications a "subject on foot" was "going back toward Keystone" and requested K-9 units to "get a perimeter set" (AC ¶ 91). Keystone Place was where Mr. Bumpass lived with his mother (AC ¶ 79). In his incident report, however, Sharp referred to "the driver of the vehicle" and "male occupant" as if he did not know the driver was Mr. Bumpass (AC ¶¶ 131, 133).

Sharp had previously arrested Timothy Bumpass, Sr. and Timothy Bumpass, Jr., distant cousins who Mr. Bumpass had never met (AC ¶¶ 63, 66-67). Sharp had pointed his gun at Timothy Bumpass, Jr. and told him, "The Bumpasses – y'all have a drug ring going on. I'm fixing to bring you motherfuckers down. None of y'all motherfuckers are shit" (AC ¶ 64). Sharp was scheduled to testify at a suppression hearing the week of December 16, 2019 because Timothy Bumpass, Sr. was challenging the legality of a traffic stop conducted by Sharp which led to gun and drug charges (AC ¶ 69).

To communications, Sharp reported, "I can't tell if he's pinned in or not. I can't tell. I'm gonna wait to get some more units to clear" (AC ¶ 93). Although at the scene, Sharp stated, "I don't know if he was poppin' a shot back at us" (AC ¶ 111), to communications, he stated, "I don't need any other units to come on scene ... Crider once you get here I'll be good" (AC ¶ 92).

3

In his incident report, Sharp claimed neither he nor Osborne approached Mr. Bumpass' car until backup units had arrived at the crash scene (AC ¶ 133). When backup arrived, Sharp and Osborne were behind their patrol car with guns pointed at Mr. Bumpass' overturned car (AC ¶ 94). They then approached Mr. Bumpass' car using their patrol car for cover (AC ¶ 133) while Sharp yelled to Mr. Bumpass, "Show me your hands!" and "Do not move!" (AC ¶ 95).

In his incident report, Sharp stated, "The occupant's head and arms were covered by a backpack ... The driver appeared to be faintly breathing but he was completely unresponsive to our commands. This made it difficult to determine the extent of the driver's injury ..." (AC ¶ 137). Nevertheless, before the nature and extent of Mr. Bumpass' injury could be seen, Sharp told Defendant Lieutenant Meyers ("Meyers") at the scene, "I think he killed himself. Shot himself in the head" (AC ¶ 109).

At the scene, both Sharp and Osborne voiced the possibility that Mr. Bumpass had shot himself accidentally while trying to shoot at them (AC ¶¶ 111, 114). However, Sharp titled his incident report, "SUICIDE" (AC ¶ 130). He included: "Once the bag was removed from near his head, it was apparent that the driver suffered self-inflicted a gunshot wound to his head" (AC ¶ 137).

Sharp also included in his incident report: "In between his legs was a desert tan Glock semi-automatic handgun. The barrel of the handgun was expelling

4

smoke as if it had just been fired" (AC ¶ 133). At the scene, Osborne also claimed to have seen smoke from the gun barrel: "I saw the glass break and the smoke come out the bar—, the barrel, the barrel smoke come out that driver's side window" (AC ¶ 115).

In fact, as confirmed by a firearms expert, "Some smoke may come out of the end of the barrel, but only a wisp and probably for no longer than 5 seconds" (AC ¶¶ 135-136). Sharp and Osborne, according to Sharp's incident report, had not approached Mr. Bumpass' car until after backup arrived, which was several minutes after they had reported "shots fired" (AC ¶ 134).

Sharp and Osborne delayed approach of Mr. Bumpass by backup units and by emergency personnel, first by acting as if Mr. Bumpass was an active shooter and then by misrepresenting that he was "a possible DOA (dead on arrival)" while knowing he was still alive (AC ¶¶ 94-95, 102-105).

In response to a police officer's question, "Where was he hit?" Osborne at the crash scene answered, "I [unintelligible] — we didn't actually ever shoot him once. We never pulled the trigger" (AC ¶ 116).

Gunshot residue tests of Sharp and Osborne were inconclusive (AC ¶ 153). Osborne both left the crash scene and put on gloves before gunshot residue tests were done on his hands (AC ¶ 152). The gunshot residue test of Mr. Bumpass' hands was never analyzed (AC ¶ 154).

5

Osborne removed a Glock firearm from Mr. Bumpass' overturned car (AC ¶¶ 106, 133). The single shell casing seen in Mr. Bumpass' overturned car was identified by an officer at the scene as a .380 (AC ¶¶ 143-144). According to Sheriff Birkhead, a 9 millimeter shell casing was later found in a trash bag of debris swept up by the tow truck driver, who did not arrive on scene until 3:08 a.m., after forensics had responded to the scene and had not found any 9 millimeter shell casing (AC ¶ 145). According to a report produced by the State Crime Lab, the 9 millimeter shell casing from the trash bag was fired from the Glock removed from Mr. Bumpass' car by Osborne (AC ¶ 146).

Sharp's patrol car was equipped to record vehicle stops (AC ¶ 156). The Sheriff's Office General Orders required the video and audio recording equipment to be activated and kept on for the duration of a vehicle stop (AC ¶¶ 155, 186). In this case, Sheriff Birkhead has claimed that no recording from Sharp's in-car camera exists for December 15, 2019 (AC ¶ 156). However, Sheriff Birkhead has never answered whether Sharp's in-car camera was on and recording when Mr. Bumpass was pulled over and shot on December 15, 2019 (AC ¶ 168).

In a text exchange in February 2020 initiated by Osborne regarding a newspaper article titled "What Happened to J'Mauri Bumpass?" when Osborne's friend texted "how do u guys not have body cams? and the car's dashboard cam is broken. fuck man. none of that is good" (AC ¶¶ 182-183), Osborne's response was:

6

"We get paid in Skittles and bubblegum ..." (AC ¶ 184). Osborne's response linked the shooting of J'Mauri Bumpass to the 2012 shooting of Trayvon Martin and the 1955 lynching of Emmett Till (AC ¶ 185).

Facts Alleged Leading to the Conclusion that Defendants Acted Pursuant to an Official Policy to Cover Up the Fatal Shooting of J'Mauri Bumpass

After Sharp and Osborne had communicated, "shots fired" at the stop of a suspicious vehicle, and Sharp had communicated, "I can't tell if he's pinned in or not," but also, "I don't need any other units to come on scene … Crider once you get here I'll be good," Defendants Crider and Meyers ("Crider" and "Meyers") arrived at the scene to find Sharp and Osborne behind Sharp's patrol car with guns drawn and pointed at Mr. Bumpass' overturned car (AC ¶¶ 90, 92-94, 96).

Both Crider and Meyers immediately muted the wireless microphones to their vehicle recording systems when initially speaking with Sharp and Osborne about what occurred, in violation of the Sheriff's Office's General Orders (AC ¶¶ 186-187). After speaking with Meyers off-microphone, when, according to Sharp's incident report, "The occupant's head and arms were covered by a backpack" and "The driver appeared to be faintly breathing," Sharp announced to Meyers, "I think he killed himself, shot himself in the head" (AC ¶¶ 109, 137).

Later at the scene, when Crider before speaking with Osborne asked if he could turn off his in-car camera, Meyers told him he could (AC ¶ 191). After

7

instructing Osborne to "give me just one sec," Meyers went into his car and turned off his in-car camera system before speaking with Osborne (AC ¶ 192). Despite acknowledging that Osborne had given a written statement about what occurred, Sheriff Birkhead has refused to produce the statement (AC ¶ 223).

When Meyers called Investigator Lounsberry to the scene, he preemptively told him over the phone before his arrival that "the driver of the vehicle fired a shot and then sped off from the traffic stop" and "the driver appears to have shot himself in the head" (AC ¶ 193).

Even after being specifically recommended and requested by Investigator Lounsberry, Defendants chose not to seek an independent investigation by the State Bureau of Investigation (AC ¶ 204). Later, when Sheriff Birkhead finally reached out to the SBI at the insistence of Plaintiff, the SBI declined to investigate due to the delay and Sheriff Birkhead's characterizing the request as for a "suicide investigation" (AC ¶ 210).

Despite an officer-involved shooting having just occurred, Meyers, the lieutenant in charge at the scene, made no efforts to secure the scene from Sharp and Osborne or to preserve evidence from Sharp and Osborne (AC ¶ 188). Before the forensics unit arrived to the scene to collect evidence, including testing the hands of Sharp and Osborne for gunshot residue, Meyers allowed Osborne to leave the scene, to put gloves on, to guard Mr. Bumpass' backpack, and to remove the

8

gun from Mr. Bumpass' car and put it in Crider's car (AC ¶¶ 152, 189).  He also allowed for Mr. Bumpass' backpack to be placed in Sharp's patrol vehicle (AC ¶ 190).

No Sheriff's deputy at the scene expressed any urgency in removing Mr. Bumpass from the wrecked car to render emergency medical treatment, despite Meyers' observation that Mr. Bumpass was alive and moving (AC ¶¶ 102, 105). Despite knowing Mr. Bumpass' home address, which was less than a mile from the scene, Defendants waited until around 4:20 a.m. – nearly four hours after the shooting and more than three hours after Mr. Bumpass was transported to the hospital – to go to his home and tell his mother that he had suffered a gunshot wound and was at the hospital (AC ¶ 121).

Sheriff Birkhead was the chief policymaker for Durham County regarding the use of force by employees of the Durham County Sheriff's Office and investigations thereof (AC ¶¶ 298, 304).  On December 15 and 16, 2019, Sheriff Birkhead issued press releases stating that deputies had attempted a traffic stop during which the vehicle struck a power pole and the driver later died at the hospital, without mentioning anything about a gunshot wound (AC ¶ 194).  Sheriff Birkhead stressed "This was not a chase" and preemptively told the press there was no wrongdoing on the part of the deputy who had conducted the stop (AC ¶ 195). On December 18, 2019, Sheriff Birkhead issued a third press release which finally

9

revealed the fatal gunshot wound while simultaneously claiming J'Mauri Bumpass' death was consistent with suicide (AC ¶ 196). Despite claiming "The Sheriff's Office investigation is ongoing," none of Sheriff Birkhead's press releases ever requested anyone with information to contact the Sheriff's Office (AC ¶ 197).

Meyers summarized Sharp's story at the scene as, "Soon as they turned the blue lights on him, he punched it. Then, well, back window broke out," with which Sharp agreed, saying, "All I did was turn my blue lights on him (AC ¶ 117). Sharp's incident report dated the day after the shooting gave a different story: Mr. Bumpass had pulled over, Sharp heard a gunshot as he was getting out of his patrol car and saw the glass blown out of the driver's side window, and the car then accelerated around the curve (AC ¶¶ 124, 126-128). Sharp also claimed in his incident report that after approaching Mr. Bumpass in the overturned car with backup units: "In between his legs was a desert tan Glock semi-automatic handgun. The barrel of the handgun was expelling smoke as if it had just been fired" (AC ¶ 133).

Sheriff Birkhead's investigators, knowing suicide is not a crime, obtained search warrants seeking "evidence of a crime and the identity of a person participating in a crime, (Name crime) Suicide" (AC ¶ 211). The search warrant for Mr. Bumpass' medical records sought only medical records for December 14 and 15, 2019, to "attest to the actions and injury sustained" (AC ¶ 214). Sheriff

Birkhead did not seek records to determine whether Mr. Bumpass had any history of depression (AC ¶¶ 212-213).

Defendants provided information to the local medical examiner which was passed along to the medical examiner who conducted the autopsy, including that "Girlfriend called police to report decedent was suicidal, driving around with a gun" (AC ¶ 198). In fact, no such call was made (AC ¶ 199). The medical examiner classified the manner of death as suicide based on Defendants' claim of what had occurred, not on any investigation of its own (AC ¶¶ 200-201).

When Sheriff Birkhead's information technology employee examined the recording system from Sharp's patrol car on December 16, 2019, he found no connection for the system to upload recordings and discovered the wiring to the uploading system had been damaged and covered with electrical tape (AC ¶¶ 157, 159). Instead of investigating who had damaged the wiring and covered the wires with electrical tape, Sheriff Birkhead misrepresented that a repair company had placed the tape on the wiring (AC ¶¶ 160-161). Defendant Captain Butler ("Butler"), who stated Sheriff Birkhead is "all about transparency" and "we have nothing to hide," when asked why he had not removed the tape to determine the condition of the wiring, replied, "I'm not feeling this conversation" (AC ¶ 233).

Sheriff Birkhead's technology director swore in an affidavit that on December 17, 2019, only a single recording, from February 2019, uploaded from

11

Sharp's in-car camera system (AC ¶ 165). The technology director also swore the last upload from the system prior to December 17, 2019 was in March 2019, but he did not explain why the February 2019 recording did not upload in March (AC ¶¶ 165-166). Sheriff Birkhead would not allow counsel for Plaintiff to speak with the technology director (AC ¶ 167).

Despite the reported issues with Sharp's in-car camera system and Plaintiff's request, Sheriff Birkhead declined to remove Sharp's in-car camera from his patrol vehicle to preserve it (AC ¶¶ 171, 174).

In violation of the order of the Superior Court, Sheriff Birkhead has also failed to produce in-car camera recordings from other responding vehicles, including those of Deputy Peter Lilje, who spoke with both Sharp and Osborne at the scene (AC ¶¶ 221-222).

Sheriff Birkhead represented that his office would receive $1 million in July 2020 for the purchase of body cameras for all of his officers and new in-car cameras for all law enforcement vehicles as part of Durham County's capital improvement plan (AC ¶ 172). As of the filing of the Amended Complaint, however, his deputies still did not wear body cameras (AC ¶ 173).

Butler declined to seek an independent investigation by the SBI and instructed Investigator Lounsberry to "just say something so the family is comforted" (AC ¶¶ 204, 206). At a meeting to discuss the death of J'Mauri

Bumpass, Butler asked Plaintiff whether she had considered hiring an investigator (AC ¶¶ 234, 237). He also claimed a Glock firearm could still have been expelling smoke from the barrel five minutes after firing a single shot and misrepresented that Sharp was not scheduled to testify at a suppression hearing in the criminal case of Timothy Bumpass, Sr. the week following the stop and shooting of J'Mauri Bumpass (AC ¶¶ 238, 240). Sharp did in fact testify at that hearing (AC ¶ 239).

Sheriff Birkhead has refused to compare the fingerprint and DNA evidence from the gun removed from Mr. Bumpass' car to that of Sharp and Osborne (AC ¶¶ 150-151). He has declined to analyze the gunshot residue test from Mr. Bumpass' hands (AC ¶ 154). He has misrepresented that Sharp's and Osborne's gunshot residue test results were negative when in fact the State Crime Lab's report expressly noted for both Sharp and Osborne that their analysis "does not eliminate the possibility that the subject could have fired a gun" (AC ¶¶ 225-226). He misrepresented that only a 9 millimeter shell casing was found at the scene when in fact a .380 shell casing was identified at the scene and the 9 millimeter shell casing was not recovered at the scene by forensics but instead was found in a trash bag reportedly later turned over by the tow truck driver (AC ¶¶ 144-145, 231-232). He misrepresented that Sharp's and Osborne's service weapons were tested at the scene and it was determined that neither had been fired, when in fact it was only determined that their magazines were full (AC ¶¶ 228-229). He has refused to

13

return Mr. Bumpass' cell phone to his estate despite extraction of the data having been completed (AC ¶ 253). He has misrepresented what has been produced to Plaintiff (AC ¶¶ 218-219, 244).

Investigator Lounsberry, the assigned investigator who specifically requested the SBI investigate the shooting of Mr. Bumpass and expressed concerns about Defendants' accounts, resigned from the Sheriff's Office, quit working in law enforcement and moved to New York (AC ¶¶ 207, 243). Sheriff Birkhead has refused to produce the public personnel records of Investigator Lounsberry and other employees (AC ¶ 244).

Meanwhile, Sheriff Birkhead twice promoted Sharp, to corporal and then to sergeant, promoted Osborne from trainee to deputy, and promoted Butler to Chief Deputy of the Detention Facility (AC ¶¶ 19, 245-246).

To magistrates, the SBI and the State Crime Lab, Sheriff Birkhead represented his office was conducting a suicide investigation (AC ¶¶ 209-211, 226). To the Department of Health and Human Services, he represented his office was conducting a use of force investigation (AC ¶ 202). To the Superior Court, he represented his purported investigation as a death investigation and a criminal investigation (AC ¶ 260). Sheriff Birkhead's claim of an ongoing investigation, however characterized, was for the purpose of concealing the Sheriff's file, which he maintained could not be turned over to Plaintiff "until it closes" (AC ¶ 260).

14

## ARGUMENT

## I. THE FACTS ALLEGED STATE A CLAIM FOR USE OF EXCESSIVE FORCE BY SHARP AND OSBORNE IN VIOLATION OF THE FOURTH AMENDMENT

J'Mauri Bumpass died from a contact gunshot wound to his head, the bullet having entered the right side of his skull and exited the left side. Only Mr. Bumpass, Sharp and Osborne were present at the scene of the shooting. Either Sharp or Osborne put a gun to Mr. Bumpass' head and pulled the trigger, or Mr. Bumpass committed suicide.

If Mr. Bumpass had put the gun to his own head and pulled the trigger, Sharp and Osborne could have reported what they had seen, heard, and done, and let the facts show the tragedy of a young man's suicide. Sharp and Osborne did not do so. Instead, they gave conflicting and untruthful accounts and made revealing statements which show the homicide of a young man at a traffic stop.

Sharp and Osborne started by reporting to communications, "Shots fired," but later stated only a single shot was fired. Sharp reported, "Car is overturned multiple times," but later stated he had not seen the crash, and all he saw upon rounding the curve to the crash scene was the car "had struck a light pole and overturned."

15

Sharp and Osborne both stated at the scene that the driver of the car had, while driving, fired shots in their direction which shattered the back windshield of his car, without ever pulling over. At the scene, Osborne changed his story to having seen the driver's side window shatter.

In his incident report, Sharp also changed his story, now claiming Mr. Bumpass had pulled over and that he then heard a single gunshot and saw the driver's side window – not the back windshield – shatter, after which the car accelerated away from the stop and crashed. The written statement of Osborne has been concealed.

Both Sharp and Osborne claimed to have seen smoke from the barrel of the gun with impossible explanations.

Osborne's claim of seeing "the barrel, the barrel smoke come out that driver's side window" conflicts with the medical examiner's finding of a contact gunshot travelling through Mr. Bumpass' skull. Sharp's claim of seeing "[t]he barrel of the handgun ... expelling smoke as if it had just been fired" minutes after the gunshot conflicts with the reality that only a wisp of smoke may come out of the end of the barrel for a few seconds at most.

Most revealing was Sharp's statement to Meyers at the crash scene, "I think he killed himself. Shot himself in the head," before the nature and the extent of Mr. Bumpass' injury could be seen, and when Mr. Bumpass "appeared to be faintly

16

breathing." As Sharp later admitted in his incident report: "The occupant's head and arms were covered by a backpack ... This made it difficult to determine the extent of the driver's injury." Nonetheless, Sharp was able to say that the driver had suffered a gunshot wound to the head which would prove to be fatal.[1]

Circumstantial facts alleged and the reasonable inferences which can be drawn therefrom support both civil claims and criminal charges. *See*, *e.g.*, Farmer v. Brennan, 511 U.S. 825, 842 (1994) (knowledge of a substantial risk element of a 42 U.S.C. § 1983 claim "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence"); United States v. Bonner, 648 F.3d 209, 213 (4th Cir. 2011) ("a conviction may rely entirely on circumstantial evidence"); United States v. Jackson, 863 F.2d 1168, 1173 (4th Cir. 1989) ("circumstantial evidence is treated no differently than direct evidence, and may be sufficient to support a guilty verdict even though it does not exclude every reasonable hypothesis consistent with innocence").

In United States v. Russell, 971 F.2d 1098 (4th Cir. 1992), the Court affirmed conviction of the defendant of first degree murder with life imprisonment where "[t]he evidence supporting Russell's conviction was all circumstantial. His wife's body was never found, there were no witnesses to the crime, and the murder

---

[1] Defendants in moving to dismiss omit entirely from their one-page "Statement of the Facts" the conflicting, untruthful, and revealing statements of Sharp and Osborne (*see* Defendants' brief, pp. 4-5). Instead, they mischaracterize the allegations in the Amended Complaint, stating as if uncontested, "As the officers began to exit the vehicle, they heard a gunshot" and "After the gunshot, Mr. Bumpass' car 'overturned multiple times'" (Defendants' brief, p. 4) when the allegations in the Amended Complaint in fact challenge the veracity of those claims.

weapon has not been located." 971 F.2d at 1100. Considering the decedent "was a successful Marine Corps officer with a promising military career," 971 F.2d at 1110, the Fourth Circuit held the circumstantial evidence – largely statements of the defendant – established or allowed inferences supporting the scenario argued by the prosecution.

In State v. Walker, 332 N.C. 520, 422 S.E.2d 716 (1992), "the lethal wound to the victim was indisputably a contact wound ...." 322 N.C. at 531; 422 S.E.2d at 725. The Supreme Court of North Carolina held the circumstantial evidence – in particular defendant's inconsistent statements – was sufficient to support an inference of guilt and to reject the defendant's claim that the victim had committed suicide, even though medical records showed the victim's history of depression and suicidal ideation, two friends of the victim testified to her threats to commit suicide, and an expert testified the victim "presented a high risk of suicide." 332 N.C. at 529; 422 S.E.2d at 721. The Court affirmed conviction of first degree murder with sentence to life imprisonment, while recognizing: "The facts of this case suggest two diametrically opposite, but equally tragic, possibilities: [the victim] was either shot by her lover in cold blood or she took her own life in his presence." 322 N.C. at 531; 422 S.E.2d at 722.

In this case, Defendants' claim that Mr. Bumpass committed suicide rests solely on one of the versions provided by Sharp and Osborne: Getting out of their

18

patrol car, they heard a single gunshot and saw the glass shatter from the driver's side window, while, as Deputy Osborne put it, "We didn't actually ever shoot him once. We never pulled the trigger."

Mr. Bumpass had no history of depression, suicidal threats or expressions, other mental health issues, violence, or drug or alcohol dependence. When pulled over, reportedly for a minor traffic violation, he had no contraband on his person or in his car and no drugs or alcohol in his system. He was gainfully employed, preparing to attend college, and on the early morning of December 15, 2019, was on his way home to pick up his sister.

To believe Defendants' claim of suicide would require believing Sharp and Osborne for some reason other than consciousness of guilt gave conflicting accounts of why they pulled Mr. Bumpass over, of whether Mr. Bumpass' car did or did not stop, and of whether it was the back windshield or the driver's side window which shattered when they head the gunshot. It would require believing both Sharp and Osborne for some reason other than consciousness of guilt falsely reported "shots fired" and seeing smoke from the gun barrel. It would require believing Sharp, upon finding Mr. Bumpass still breathing but unresponsive in the wrecked car, before the nature and location of his injuries could be seen, somehow reached the conclusion that Mr. Bumpass had suffered a gunshot wound to his head which would be fatal.

19

The facts alleged in the Amended Complaint fully support the inference that Sharp and Osborne, acting in concert, fatally shot Mr. Bumpass and then intentionally delayed medical assistance to be sure Mr. Bumpass would not be able to tell what they had done. The facts alleged fully support the inference that Sharp and Osborne floated various stories – Mr. Bumpass had fled the crash heading toward his home, Mr. Bumpass was injured when the car overturned multiple times, self-defense after Mr. Bumpass shot at them through the back windshield, and accidental self-inflicted gunshot – before settling on the only story which would square with the contact gunshot wound they knew the medical examiner would find: suicide.

Yet later, when off-guard texting with a friend, Osborne chose imagery linking the shooting of Mr. Bumpass not to any case of suicide, but to the shooting of Trayvon Martin and the lynching of Emmett Till – the first a case of intentional shooting, the second a case of joint homicidal action. This statement by Osborne, along with the other statements of both Sharp and Osborne showing consciousness of guilt, supports the reasonable inference that Sharp and Osborne acted jointly to fatally shoot Mr. Bumpass.

In <u>Jackson v. Pantazes</u>, 810 F.2d 426 (4th Cir. 1987), the Fourth Circuit held a police officer "may be liable under Sec. 1983 by reason of his participation in [a bail bondsman's] alleged deprivations of plaintiff's constitutional rights" where

20

"the fact finder could reasonably conclude that [the police officer] engaged in concerted activity with [the bail bondsman] to deprive plaintiff of her constitutional rights."  810 F.2d at 427, 430.  Here, the jury could reasonably conclude from the facts alleged that Sharp and Osborne engaged in concerted activity using excessive force in violation of the Fourth Amendment.

Whether the pulling of the trigger was intentional or reckless, putting a loaded gun to Mr. Bumpass' head – which the medical examiner's finding of a contact gunshot wound establishes – constituted use of excessive force in violation of the Fourth Amendment.  Whether it was Sharp or Osborne who put the loaded gun to Mr. Bumpass' head, the jury could reasonably conclude from the facts alleged that the two acted in concert to deprive Mr. Bumpass of his constitutional rights.  Both Sharp and Osborne made conflicting, untruthful, and revealing statements which amply support the inference that both participated in the constitutional violation.

Defendants' argument that "the allegation that Sharp and Osborne caused the death of the decedent is a conclusion reached by Plaintiffs based entirely on speculation, with no factual allegations to support such a conclusion" (Defendants' Brief in Support of Motion to Dismiss Amended Complaint, p. 4) is frivolous.  The Amended Complaint is replete with specific allegations showing how Sharp and Osborne have implicated themselves in the shooting of J'Mauri Bumpass.

21

Defendants' argument that "the Complaint is entirely devoid of any factual allegations to support this reckless, baseless, and inflammatory accusation" (Defendants' brief, p. 13) completely ignores the multitude of facts alleged in Plaintiffs' Amended Complaint which support the claim that Sharp and Osborne acted in concert to fatally shoot Mr. Bumpass. The factual allegations in the Amended Complaint are more than sufficient to "'raise a right to relief above the speculative level' so as to 'nudge[] the[] claims across the line from conceivable to plausible.'" Armstrong v. City of Greensboro, 190 F. Supp. 3d 450, 459 (M.D.N.C. 2016) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

Even if Defendants' version of suicide could be believed considering all the facts to the contrary, such would raise only a question for the jury to determine.

II. THE FACTS ALLEGED STATE A CLAIM FOR THE ABUSE OF GOVERNMENTAL POWER BY SHERIFF BIRKHEAD, SHARP, OSBORNE, CRIDER, MEYERS AND BUTLER WHICH SHOCKS THE CONSCIENCE IN VIOLATION OF THE FOURTEENTH AMENDMENT

The Supreme Court in 1998 recognized "the exercise of power without any reasonable justification in the service of a legitimate governmental objective" violates the Fourteenth Amendment. County of Sacramento v. Lewis, 523 U.S. 833, 845-846 (1998). Abuse of governmental power so egregious as to shock the conscience establishes a claim for relief under 42 U.S.C. § 1983. Dean v.

22

McKinney, 976 F.3d 407 (4th Cir. 2020) (affirming the denial of summary judgment for defendant for conduct in 2016).

Here, despite having reported "shots fired" and "I can't tell if he's pinned in or not," Sharp requested to all responders that only Crider respond to the scene, stating, "I don't need any other units to come on scene ... Crider once you get here I'll be good." Sharp, while reporting an active shooter, only requested a single specific officer respond to the scene. Crider and Meyers immediately were put on notice of suspicious conduct by Sharp.

Crider and Meyers then acted upon arrival at the scene to cover up whatever Sharp and Osborne had done by manually muting the microphones to their in-car camera systems when speaking with them, in direct violation of the Sheriff's Office's General Orders. After speaking with Sharp off-microphone, Meyers, the supervising lieutenant on scene, heard Sharp announce, "I think he killed himself. Shot himself in the head" – when Meyers had seen Mr. Bumpass in the overturned car, his head and arms covered by a backpack, concealing from view the location, nature and severity of Mr. Bumpass' injuries.

Despite Sharp's specific claim of a self-inflicted mortal gunshot wound to the head which he claimed not to have witnessed, when, from all that appeared, Mr. Bumpass' then-unknown injuries could have resulted from the car crash, Meyers deliberately declined to secure the scene from Sharp and Osborne and to secure

23

evidence from them, including allowing Osborne to both leave the scene and put gloves on before any gunshot residue test, allowing Osborne to remove the gun from Mr. Bumpass' car and place it in Crider's car, and allowing the backpack from Mr. Bumpass' car to be placed in Sharp's car and then removed and guarded by Osborne. Meyers also allowed Crider to turn off his in-car camera system before speaking with Osborne, and himself also turned off his in-car camera system before speaking with Osborne.

Meyers both acted to cover up what Sharp and Osborne had done and to prevent investigation of what they had done. When Meyers called Investigator Lounsberry, he preemptively told him, "the driver of the vehicle fired a shot and then sped off from the traffic stop" and "the driver appears to have shot himself in the head."

When Investigator Lounsberry at the scene determined this investigation needed to be handled by the SBI and asked that they be called, Butler declined to call for an independent investigation. The following day, Butler instructed Investigator Lounsberry to "just say something so the family is comforted."

Sheriff Birkhead also immediately acted both to cover up what had occurred and to prevent investigation. His initial press releases, on the day of and the day

24

after the shooting, disclosed only that a driver had died after a car crash and declined to request anyone with information to contact the Sheriff's Office.[2]

At the scene, Meyers explained to the other officers in the presence of Sharp, "Soon as they turned the blue lights on him, he punched it. Then, well, back window broke out." Sharp agreed, saying, "All I did was turn my blue lights on him."

The problem with Sharp's story at the scene, which Meyers adopted, is that Mr. Bumpass died from a shot fired from a gun placed in contact with his head. Sharp knew this from what he and Osborne had done. Accordingly, in writing his incident report dated the day after the shooting, Sharp changed his story to seeing the driver's side window shatter while he was getting out of his patrol car after Mr. Bumpass had complied with the traffic stop.[3] After floating various stories at the scene, Deputy Sharp settled on "SUICIDE" in titling his incident report.

The Sheriff's Office immediately adopted the story of suicide. In applying for a search warrant for medical records, Sheriff Birkhead's investigators feigned

---

[2] Defendants' argument that Sheriff Birkhead did not personally act to cover up the shooting of Mr. Bumpass (Defendants' brief, p. 20) is without merit. The factual allegations in the Amended Complaint of specific, consistent, and continuing actions of the agents of Sheriff Birkhead to prevent investigation of the shooting amply support the inference that Sheriff Brikhead participated personally. Moreover, Sheriff Birkhead cannot shield himself from individual liability by acting through his agents, just as he cannot avoid official capacity liability by delegating his policymaking authority. See Hunter v. Town of Mocksville, 897 F.3d 538, 558 (4th Cir. 2018).

[3] Defendants' argument, "As events quickly unfolded, confusion can easily ensue, creating difficulty in trying to recall what happened," (Defendants' brief, p. 15) is nonsense. No information was subsequently obtained which could change Sharp's and Osborne's recollection of which window they saw shatter, or whether or not Mr. Bumpass' car pulled over and stopped, or which could explain why they falsely claimed to have seen gun barrel smoke or why they knew about things they supposedly had not seen.

25

investigation, claiming to be seeking evidence of the nonexistent crime of suicide. They sought medical records only from the early morning in question rather than any records which might show a history of depression, evidently to find whether Mr. Bumpass had been able to tell anyone who had shot him.

Sheriff Birkhead's investigators seized Mr. Bumpass' cell phone, again feigning investigation of the noneexistent crime of suicide, not to find evidence of suicide, but to prevent examination of the contents for evidence of what Sharp and Osborne had done. Sheriff Birkhead still refuses to return Mr. Bumpass' phone to his estate, continuing to claim an ongoing investigation, despite the data from the phone having been extracted and no evidence supporting suicide having been found.

In his incident report, Sharp included: "The barrel of the handgun was expelling smoke as if it had just been fired." Sheriff Birkhead, Butler, Meyers, Crider, and every other employee of the Sheriff's Office who had ever fired a handgun knew any smoke from a gunshot would last no more than a few seconds, so the handgun in Mr. Bumpass' car at the crash scene could not have been expelling smoke from the single gunshot which Sharp and Osborne claimed occurred minutes before their approach of Mr. Bumpass' overturned car.

Nonetheless, Sheriff Birkhead, despite the "smoking gun" falsehood in Sharp's incident report, issued his press release two days later, "that 18-year-old

26

J'Mauri J. Bumpass of Durham died as the result of a 'close-range gunshot wound, consistent with suicide.'"

Sheriff Birkhead adjusted the characterization of his feigned investigation depending on whose investigation he was blocking. To prevent investigation by the SBI and the State Crime Lab, he characterized it as a suicide investigation. To prevent the medical examiner from investigating, he provided only information supporting the claim of suicide, including false information about a call to police. To prevent the Superior Court from ordering production of his files to Plaintiff, he represented a criminal investigation was ongoing. To prevent the Department of Health and Human Services from producing his reports to Plaintiff, he characterized it as a use of force investigation.

Despite claiming "Sheriff Birkhead is all about transparency" and "we have nothing to hide," when asked why he had not removed the electrical tape on the wiring to Sharp's recording uploading system to determine the condition of the wiring, Butler responded, "I'm not feeling this conversation." Butler also misrepresented that a Glock firearm could still have been smoking five minutes after firing a single shot and that Sharp was not scheduled to testify at a suppression hearing in the case of Timothy Bumpass, Sr. the week following the shooting of J'Mauri Bumpass. As head of the Criminal Investigations Division, purportedly tasked with overseeing the investigation of the shooting death of

27

J'Mauri Bumpass, Butler implicitly acknowledged there was no investigation when he asked whether Plaintiff had considered hiring an investigator.

To further impede investigation by Plaintiff, Sheriff Birkhead has refused to produce Osborne's written statement of what occurred; has refused to produce all law enforcement recordings from the scene, in violation of the order of the Superior Court; has misrepresented that only a 9 millimeter shell casing was found at the scene;[4] has refused to compare the fingerprint and DNA evidence from the gun removed from Mr. Bumpass' car to that of Sharp and Osborne; has misrepresented that the gunshot residue test results for Sharp and Osborne were negative;[5] has refused to have the gunshot residue test of Mr. Bumpass' hands analyzed; has misrepresented that the service weapons of Sharp and Osborne were tested at the scene and determined not to have been fired; has refused to disclose whether Sharp's in-car camera system was working and recording on the early morning of December 15, 2019; has misrepresented who placed the electrical tape on the wiring to Sharp's recording uploading system; has refused to disclose the

---

[4] Defendants falsely assert "A 9-millimeter shell casing, fired from the Glock firearm, was found in Mr. Bumpass' car" (Defendants' brief, p. 4) when in fact the Amended Complaint alleges the shell casing found in Mr. Bumpass' car was identified as a .380, and the 9 millimeter shell casing which Sheriff Birkhead represented had been found at the scene was in fact later found in a trash bag reportedly turned in by the tow truck driver who responded to the scene hours after the shooting and after forensics had responded and not found any 9 millimeter shell casing (AC ¶¶ 144, 145, 231, 232).

[5] Defendants falsely assert "Gun Shot Residue (GSR) tests performed on both Sharp and Osborne did not determine the presence of gunshot residue on either defendant" and "the Amended Complaint states that no gunshot residue was found on either Sharp or Osborne," (Defendants' brief, pp.5, 15) when it in fact alleges that the results of the gunshot residue tests, taken after Osborne had both left the scene and put gloves on, were inconclusive, and did "not eliminate the possibility that the subject[s] could have fired a gun," and that Sheriff Birkhead refused to produce the underlying data from the State Crime Lab (AC ¶¶ 152, 153, 226, 227).

28

condition of the tampered wiring to Sharp's uploading system beneath the electrical tape; has destroyed evidence by refusing to preserve Sharp's in-car camera system; has refused to produce the public personnel records of Investigator Lounsberry and other employees; and has repeatedly misrepresented what has been produced to Plaintiff. Sheriff Birkhead's promotions of Sharp and Osborne while claiming an investigation was ongoing makes clear that no actual investigation was ever conducted.

The Amended Complaint does not "simply make[] allegations showing that the Plaintiffs are unsatisfied with the investigation" (Defendants' brief, p. 27). The Amended Complaint makes clear this is a case of the abuse of investigatory power to *prevent* investigation. From the moment Sharp and Osborne reported "Shots fired" to communications and responders, Defendants all have acted deliberately and consistently to cover up and block investigation of how Mr. Bumpass was fatally shot.

Defendants' argument, "The Plaintiffs disagree with the medical examiner's findings and are improperly using this legal action to dispute those findings" (Defendants' brief, p. 18) mischaracterizes this action. The medical examiner's finding was a fatal contact gunshot wound. The classification of the manner of death as suicide relied entirely on the false information supplied by Defendants. *Compare* State v. Daughtridge, 248 N.C. App. 707, 722-724, 789 S.E.2d 667,

675-676 (2016) (medical examiner's opinion of manner of death based on non-medical information from law enforcement officers inadmissible under evidence Rule 702).

The fatal shooting at a traffic stop of a young black man who was on his way to his mother's home to pick up his sister, who graduated early from high school, who was working and preparing to attend college, his life criminally cut short by officers sworn to protect him, is outrageous. For Defendants to then use their investigatory power not to investigate, but to cover up what was done and block others from investigating by a feigned investigation based on misleading press releases, false reports, concealed evidence, fabricated evidence, tampered wiring, misrepresentations and mischaracterizations, is so egregious, so outrageous as to shock the conscience in violation of the Fourteenth Amendment.

As in Dean v. McKinney, a reasonable jury could conclude that Defendants' "conduct was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" 976 F.3d at 416 (quoting County of Sacramento v. Lewis, above, 523 U.S. at 847, n.8).

Recognizing that the factual allegations of the Amended Complaint in this case show conduct so egregious, so outrageous as to shock the conscience will not "allow[] anyone to initiate legal actions against public officials when he/she simply does not agree with the findings of a particular matter" (Defendants' brief, p. 18).

The facts alleged in the Amended Complaint show an extreme abuse of governmental power by Defendants which cannot be tolerated.

III.  THE FACTS ALLEGED STATE CLAIMS FOR MUNICIPAL LIABILITY THROUGH A POLICY OF COVERING UP THE USE OF EXCESSIVE  FORCE WHICH CAUSED DEFENDANTS' VIOLATIONS OF THE FOURTH  AND FOURTEENTH AMENDMENTS

Sharp and Osborne immediately, falsely reported "shots fired" out the back windshield in preparation to claim they acted in self-defense in shooting Mr. Bumpass, knowing that Sheriff's Office policy was to cover up the use of excessive force by deputies as long as they could come up with a plausible explanation for their conduct.  The existence of such a policy was then demonstrated when Crider and Meyers, the supervising lieutenant, arrived on the scene and immediately muted their microphones – in direct violation of written "policy" – to plan privately what the explanation would be.  The immediacy of Defendants' actions makes clear the policy to cover up was in place at the time Sharp and Osborne used excessive force against Mr. Bumpass.

After Sharp conferred off-microphone with Meyers, he announced the explanation:  a self-inflicted, fatal gunshot wound to the head.  After further consideration, Sharp, in his incident report the next day, modified the explanation

31

to suicide to account for what he knew but claimed not to have seen: that the fatal injury was inflicted by a contact gunshot.

At no point did Sheriff Birkhead or anyone in authority in the Sheriff's Office question the changing stories, revealing statements, and false claims of Sharp and Osborne. Instead, Sheriff Birkhead, himself and through his deputies and agents, as alleged in the Amended Complaint, deliberately and consistently acted to conceal and even destroy evidence and to prevent any investigation.

The facts alleged in the Amended Complaint fully support the conclusion that when Sharp and Osborne acted in concert to shoot Mr. Bumpass in violation of the Fourth Amendment, they did so because they knew the Sheriff's Office policy was in place to protect them. Municipal liability results "when execution of a government's policy or custom … by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell v. Department of Social Services of New York, 436 U.S. 658, 694 (1978).

Even if the policy had not been in place prior to the shooting of Mr. Bumpass, "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). "Where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. To deny compensation to

32

the victim would therefore be contrary to the fundamental purpose of § 1983." Id. at 481.

As alleged in the Amended Complaint, Sheriff Birkhead was the chief policymaker for Durham County regarding the use of force by employees of the Durham County Sheriff's Office and investigation thereof. In using his governmental authority to deliberately cover up the use of excessive force by Sharp and Osborne against Mr. Bumpass and to block any investigation thereof, Sheriff Birkhead implemented a policy in violation of the Fourteenth Amendment for which he in his official capacity and Defendant Durham County are liable.

N.C.G.S. § 153A-103, in the statutory chapter entitled "Counties," authorizes county boards of commissioners to "fix the number of salaried employees in the offices of the sheriff" subject to the limitation that "Each sheriff … has the exclusive right to hire, discharge, and supervise the employees in his office." Accordingly, counties have policymaking authority over the sheriff except in the hiring, discharging and supervision of employees.

In Parker v. Bladen County, 583 F. Supp. 2d 736 (E.D.N.C. 2008), the plaintiff's claim was inadequate policy on the use of tasers and training and supervision in the use thereof. The District Court held the claim was "employment- and training-related" and therefore within the supervision of employees over which, by statute, the sheriff has exclusive policymaking authority.

33

Plaintiff's claim in this case is not about the training or supervision of employees. Plaintiff's claim is Sheriff Brikhead's abuse of governmental power to cover up and block investigation of the use of excessive force by his deputies for no governmental purpose. Durham County's policymaking authority on investigation of the use of force by Sheriff's employees is not limited by N.C.G.S. § 153A-103. Indeed, Durham County has exercised its policymaking authority regarding investigation of the use of force by Sheriff's deputies in its 2020 capital improvement plan by including funding for the purchase of body worn cameras for all of Sheriff Birkhead's officers and new in-car cameras for all law enforcement vehicles.[6] As of December 15, 2019, however, Durham County had completely delegated its policymaking authority in this area to Sheriff Birkhead, making him the chief policymaker for Durham County regarding investigation of the use of force by employees of the Durham County Sheriff's Office.

On the facts as alleged in the Amended Complaint, a reasonable jury could readily find that a policy was in place that caused the Fourth Amendment violation on December 15, 2019, and was implemented causing the Fourteenth Amendment violation on December 15, 2019 and thereafter.

---

[6] Durham County now implicitly asserts that it lacks authority to direct the purchase of cameras as it did in its 2020 capital improvement plan.

# IV. THE FACTS ALLEGED STATE CLAIMS FOR ACTION ON SHERIFF BIRKHEAD'S OFFICIAL BOND, WRONGFUL DEATH BY INTENTIONAL ASSAULT AND BATTERY, COMMON LAW OBSTRUCTION OF JUSTICE AND RECKLESS INFLICTION OF EMOTIONAL DISTRESS UNDER NORTH CAROLINA LAW

## A. ACTION ON OFFICIAL BOND

Suit against Sheriff Birkhead and Defendant Travelers Casualty and Surety Company of America on the Sheriff's official bond is authorized by N.C.G.S. § 58-76-5 for injury caused by misconduct, misbehavior and breach of official duties by the Sheriff and his employees.

The conduct of Sheriff Birkhead, Sharp, Osborne, Crider, Meyers and Butler, as alleged in the Amended Complaint, undoubtedly constitutes misconduct, misbehavior and breach of their official duties. The purchase of the bond constitutes a waiver of governmental immunity to the extent of the bond.

## B. ASSAULT AND BATTERY

Assault is an intentional act or display of force and violence which threatens the plaintiff with imminent bodily injury. N.C.P.I. Civil 800.50 (2020). Battery is intentional bodily contact without the plaintiff's consent which offends the plaintiff's personal dignity. N.C.P.I. Civil 800.51 (2020).

35

The medical examiner found Mr. Bumpass suffered a fatal *contact* gunshot wound to the head. The contact nature of the wound shows the gun was intentionally put to Mr. Bumpass' head.

As argued above, the facts alleged in the Amended Complaint support the inference that Sharp and Osborne acted jointly in fatally shooting Mr. Bumpass. Accordingly, Sharp's and Osborne's intentional act of putting a gun to Mr. Bumpass' head constitutes an assault and battery.

C. OBSTRUCTION OF JUSTICE

In Henry v. Deen, 310 N.C. 75, 87, 310 S.E.2d 326, 334 (1984), the North Carolina Supreme Court held that the defendants' alleged concealment and fabrication of evidence, "if found to have occurred, would be acts which obstruct, impede or hinder public or legal justice and would amount to the common law offense of obstructing public justice."

Defendants' acts as alleged in the Amended Complaint – including intentionally delaying medical treatment and family contact, muting their microphones, issuing misleading press releases, providing false information to medical examiners and the SBI, destroying and concealing material evidence, and preventing any investigation – support the claim that Defendants acted intentionally to obstruct justice.

36

"Actions that are malicious, corrupt or outside the scope of official duties will pierce the cloak of official immunity, thus holding the official liable for his acts like any private individual." Moore v. Evans, 124 N.C. App. 35, 42, 476 S.E.2d 415, 412 (1996).

Defendants' abuse of their governmental power to prevent investigation of the fatal shooting of J'Mauri Bumpass to conceal what Sharp and Osborne had done, not for any legitimate purpose but to shield themselves from liability, was malicious, corrupt, and outside the scope of their official duties.

D. RECKLESS INFLICTION OF EMOTIONAL DISTRESS

After the egregious and unlawful act of fatally shooting J'Mauri Bumpass, Defendants covered up the truth and falsely claimed that Mr. Bumpass' death was a suicide, causing Plaintiffs severe emotional distress in addition to the grief they were already experiencing over the death their eighteen-year-old son. Defendants' actions were malicious, corrupt and outside the scope of their official duties, with Defendants' intention being to shield themselves from liability, recklessly inflicting emotional distress.

Liability for reckless infliction of emotional distress results when defendants engaged in extreme and outrageous conduct recklessly indifferent to the likelihood it would cause severe emotional distress to the plaintiffs and caused severe

37

emotional distress. N.C.P.I. Civil 800.60 (2020). Conduct is extreme and outrageous when it exceeds all bounds usually tolerated by decent society. Id.

For any parent, the death of a child is unimaginable. But for parents to be told their child committed suicide adds to the already incredible loss feelings of confusion and self-blame that are unshakeable. The Defendants' deliberate choice of suicide as their explanation to cover up the truth of the fatal shooting of J'Mauri Bumpass recklessly inflicted upon Plaintiffs the unanswerable questions and unforgivable self-blame that inevitably haunt parents whose child committed suicide: "Why was my child suicidal? How did I miss the signs? How could I have prevented this? How can I ever forgive myself?"

CONCLUSION

The dispute in this case is factual, not legal. Plaintiffs claim it outrageous for Defendants to have fatally shot J'Mauri Bumpass, deliberately covered it up, prevented investigation and mischaracterized the shooting as a suicide. Defendants claim it outrageous for Plaintiffs to allege that they shot Mr. Bumpass and then acted to cover it up. The facts of this case present two diametrically opposite possibilities – one tragic and the other criminal – for the jury to weigh and determine.

38

The facts alleged in the Amended Complaint fully support each of the claims for relief asserted. The Defendants' Motion to Dismiss should be denied in all respects.

Respectfully submitted this the 27th day of July, 2021.

/s/ L. Allyn Sharp
L. Allyn Sharp
Allyn Sharp Law, PLLC
P.O. Box 730
Carrboro, NC 27510
Telephone: (919) 265-9200
Facsimile: (919) 869-1874
allynsharplaw@gmail.com
N.C. State Bar No. 43195
Counsel for Plaintiffs

## CERTIFICATE OF WORD COUNT

Pursuant to this Court's Text Order entered July 14, 2021 granting Plaintiffs leave to exceed the word-count allowed under Local Rule 7.3(d), the undersigned verifies that this **Brief in Support of Plaintiff's Response to Defendants' Motion to Dismiss Amended Complaint**, does not exceed 9,375 words – including the body of the brief and its headings and footnotes, but excluding the cover page, index, table of authorities cited, caption, signature lines, certificate of service and this verification.

This the 27th day of July, 2021.

/s/ L. Allyn Sharp
L. Allyn Sharp
Allyn Sharp Law, PLLC
P.O. Box 730
Carrboro, NC 27510
Telephone: (919) 265-9200
Facsimile: (919) 869-1874
allynsharplaw@gmail.com
N.C. State Bar No. 43195
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document entitled, **Brief in Support of Plaintiffs' Response to Defendants' Motion to Dismiss Amended Complaint**, was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of the filing to the following person:

Larissa S. Williamson
Durham County Attorney's Office
lwilliamson@dconc.gov
Counsel for Defendants

This the 27th day of July, 2021.

/s/ L. Allyn Sharp
L. Allyn Sharp
Allyn Sharp Law, PLLC
P.O. Box 730
Carrboro, NC 27510
Telephone: (919) 265-9200
Facsimile: (919) 869-1874
allynsharplaw@gmail.com
N.C. State Bar No. 43195
Counsel for Plaintiffs